FILED

08/31/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2018

## IN RE ROMEO T. ET AL.

**Appeal from the Juvenile Court for Rutherford County**
**No. TC2400T          Donna Scott Davenport, Judge**

———————————————————

## No. M2018-00269-COA-R3-PT

———————————————————

This is a termination of parental rights case. Mother/Appellant appeals the termination of her parental rights to two minor children on the grounds of: (1) abandonment by willful failure to visit; Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i); (2) substantial noncompliance with the requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and (3) persistence of the conditions that led to the children's removal from Mother's home, Tenn. Code Ann. § 36-1-113(g)(3). The trial court also found that termination of Mother's parental rights is in the children's best interest. On appeal, Appellee, the Tennessee Department of Children's Services, concedes that the persistence of conditions ground is not applicable to Appellant because the record does not contain a final adjudicatory order of dependency and neglect. We agree; accordingly, we reverse the trial court's termination of Appellant's parental right on that ground. The order is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed in Part; Affirmed in Part; and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Carl Moore, Murfreesboro, Tennessee, for the appellant, Tawanna T.

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Deputy Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

### I. Background

Tawanna T. ("Mother," or "Appellant") is the biological mother of the two minor

children at issue in this case, Romeo T. (d/o/b/ July 2010) and Davieon T. (d/o/b June 2012) (together, the "Children").[1] The Tennessee Department of Children's Services ("DCS," or "Appellee") became involved with this family on November 7, 2013 after receiving a referral alleging lack of supervision. There were concerns that Mother left the Children unattended in the home. Neighbors stated that they often heard the Children crying and screaming for hours and late into the night. DCS attempted to contact Mother several times but was unable to reach her until February 3, 2014. On that date, Mother appeared in the Rutherford County Juvenile Court ("trial court") in another matter, involving allegations of disorderly conduct by Mother's then minor child, Jermont T.[2] At this hearing, Mother refused to submit to a drug test. Based, *inter alia*, on Mother's refusal, the trial court entered an order, on February 6, 2014, placing the Children in DCS custody. Specifically, the trial court found that Mother "is unable at this time to provide adequate supervision and is unable to meet the needs of the children at this time." The trial court ordered supervised visitation on the condition that Mother submit to and pass random drug screens. The trial court further specified that "[i]f Mother fails a drug screen prior to a scheduled visit then said visit is forfeited."

On February 25, 2014, DCS and Mother participated in a family team meeting and developed the first permanency plan for the Children. The plan was revised several times, and each revision was ratified by the trial court. *See* further discussion *infra*. Although Mother initially worked toward completion of the permanency plan requirements, by March 2016, Mother was missing visits and refusing random drug screens. When the permanency plan was revised on July 18, 2016, DCS noted that Mother was not complying with drug screens and had been using illicit drugs for approximately three months. Alyssa Burton, the family's Youth Villages caseworker, testified that, during a visit with the Children in June 2016, Mother was verbally aggressive with the Children and with Ms. Burton. The visit took place at a restaurant, and, when Mother attempted to feed the Children, Ms. Burton informed Mother that the Children had already eaten lunch. According to Ms. Burton, Mother became verbally aggressive and also made a movement toward Ms. Burton, which she interpreted as aggressive or threatening. On August 17, 2016, DCS filed a motion to suspend Mother's visitation, asserting that the visits had become disruptive to the Children's emotional stability. On September 8, 2016, Mother failed a random drug screen, testing positive for cocaine. From October 10, 2016 through February 10, 2017, Mother visited the Children two times. During this time, Mother also refused several drug screens.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] Jermont T. (d/o/b/ September 1997) was 17 years old at the time of the trial court proceedings. He reached the age of majority prior to the filing of the petition for termination of parental rights at issue in this appeal. Accordingly, he is not a subject of the appeal.

On February 10, 2017, DCS filed a petition to terminate Mother's parental rights.[3] As grounds, DCS alleged: (1) abandonment by willful failure to visit; (2) substantial noncompliance with the requirements of the permanency plan; and (3) persistence of the conditions that led to the Children's removal from Mother's home. Following a three day hearing, the trial court terminated Mother's parental rights by order of January 19, 2018. The trial court held that DCS had met its burden by clear and convincing evidence as to all three grounds asserted in the petition and also held by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interests. Mother appeals.

## II. Issues

There are two dispositive issues, which we state as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds for termination of Appellant's parental rights.

2. If so, whether there is clear and convincing evidence to support the trial court's determination that termination of Appellant's parental rights is in the Children's best interests.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. §§ 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of

---

[3] DCS also sought termination of the Children's father's parental rights. By amended order of December 4, 2017, the trial court terminated father's parental rights. He is not a party to this appeal.

proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B***., 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Grounds for Termination of Parental Rights

As noted earlier, the trial court relied on three statutory grounds in terminating Appellant's parental rights: (1) abandonment by willful failure to visit; Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i); (2) substantial noncompliance with the requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and (3) persistence of the conditions that led to the children's removal from Mother's home, Tenn. Code Ann. § 36-1-113(g)(3). Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." ***In re Angela E.***, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review each of the foregoing grounds.

## A. Abandonment by Willful Failure to Visit

Termination of a parent's rights may be initiated based on "[a]bandonment by the parent or guardian, as defined in § 36-1-102 . . . ." Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 outlines several definitions of "abandonment." As is relevant to this case, the statute provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

- 4 -

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians . . . have failed to visit . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i). DCS filed its petition to terminate Mother's parental rights on February 10, 2017; accordingly, the relevant statutory time period applicable to the ground of abandonment is October 9, 2016 to February 9, 2017.

Concerning the statutory requirement that a parent's failure to visit must be willful, this Court discussed that criterion as follows:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child . . . unless the parent has . . . "willfully" . . . failed to support the child for a period of four consecutive months. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing ....

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted). For purposes of the ground of abandonment by willful failure to visit, Tennessee Code Annotated section 36-1-102(1)(E) defines "willful failure to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." The statute defines "token visitation" to mean "that the visitation, under the circumstances of the individual case, constitutes no more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). "Whether a parent failed to visit . . . a child is a question of fact. Whether a parent's failure to visit . . . constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*,

215 S.W.3d at 810).  As previously discussed, this Court reviews questions of law de novo with no presumption of correctness.  *Id*.

In its order terminating her parental rights, the trial court found, in relevant part, that

[d]uring the relevant statutory time period . . . [Mother] had two (2) visits with the children.  The court finds that during the relevant statutory time period [Mother] was allowed to visit a minimum of four hours per month after passing a random drug screen.  The court finds that [DCS] stood ready, willing and bent over backwards to engage [Mother] to assist her with complying with the drug screens and to facilitate visitation.  The court finds that [DCS] attempted to contact [Mother] by texting, calling, going to her reported place of employment and attempting to make home visits.  The court finds that [Mother] would not return phone calls to [DCS] or avail herself for drug screens.  The court finds that participating in drug screens are a two-way street and a parent has to show up to participate and do their part.

The court finds that during the relevant statutory time period [Mother] was in rehab from November 22, 2016 – December 7, 2016, which was for a period of two weeks.  The court finds that the two weeks of rehab was an insignificant time period because [Mother] could have exercised visitation prior to entering rehab and after her release from rehab.  The court finds that from October 10, 2016 – November 22, 2016, [Mother] had zero (0) visits with the children.  The court finds that when [Mother] was released from rehab on December 7, 2016 she had no visits until January 13, 2017.  The court finds that when [Mother] was released from rehab she exercised visitation twice on January 13, 2017 and January 27, 2017.  The court finds that [Mother] had zero visits from January 27, 2017 – February 10, 2017.

The court finds that [Mother] knew the consequences of her failure to visit the children because the consequences were explained to her and she signed the criteria for termination of parental rights.  The court finds that [Mother] was explained [sic] that abandonment for her failure to visit was one ground that could be used against her in a termination of parental rights proceeding.  The court finds that [Mother] abandoned the children by willfully and intentionally failing to visit during the statutory time period.

The record supports the trial court's findings.  Ms. Burton testified that, from October 10, 2016 through February 10, 2017, Mother was scheduled for seven visits with the Children.  Of that number, Ms. Burton testified that Mother attended two visits and missed five.  Ms. Burton's testimony was corroborated by that of DCS family services worker Elizabeth Brown.  The record reveals that Mother's lack of visitation was due primarily to her refusal to submit to the required drug screens.  From the testimony,

Mother did not complete drug screens on the following dates: (1) October 14, 2016, (2) November 11, 2016, (3) February 10, 2017. Ms. Burton testified that Mother visited the Children on January 13 and 27, 2017, which was approximately one month before DCS filed its petition to terminate her parental rights. Ms. Burton stated that, aside from the two January 2017 dates, Mother had not seen the Children since June 29, 2016. In view of the fact that Mother missed more than seventy percent of her visits during the applicable period, we conclude that the two January 2017 visits constitute mere token visitation.

The only requirement for Mother to exercise visitation was for her to submit to and pass drug screens. Ms. Burton confirmed that Mother missed nearly six months of visits due to her refused and missed drug screens. A parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child. *See **In re Malaina H.**, No. E2008-00910-COA-R3-PT, 2008 WL 5263600, at \* 9 (Tenn. Ct. App., Dec. 16, 2008) (upholding termination of mother's parental rights for willfully failing to visit her child where additional visitation opportunities would have been made available to the mother if she passed a drug test). Likewise, in the instant case, the record clearly indicates that Mother was either unwilling to take, or unable to pass, a drug test so as to exercise visitation rights in a consistent manner during the four-month period before the termination petition was filed. From the totality of the circumstances, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by willful failure to visit.

## B. Substantial Noncompliance with the Requirements of the Permanency Plans

As noted above, on February 25, 2014, DCS and Mother participated in a family team meeting and developed the first permanency plan for the Children. Under the plan, Mother's responsibilities were as follows:

- Sign releases to allow DCS to communicate with all treatment providers;
- Participate in individual counseling as recommended . . .;
- Participate in medication management and take medication as prescribed;
- Develop a written budget and provide a copy to DCS;
- Provide DCS with proof of legal income to support the Children (may be through public assistance or verified employment);
- Have a stable home free from safety hazards;
- Not allow anyone who uses drugs to live in the home;
- Develop a transportation plan and provide it to DCS;
- Cooperate in random, unannounced medication pill counts to ensure that Mother is only taking medication as prescribed;
- Take random, unannounced urinalysis drug screens. Mother will make herself

available within four hours of being called by DCS. She will successfully pass drug screens;
- Complete a parenting assessment with an A & D component and follow all recommendations thereof;
- Visit the Children on a regular basis, at least two times per month;
- Ensure the Children's needs are being met during the visits, including supplies, food, and diapers;
- Not incur any new charges

At the second child and family team meeting on August 25, 2014, Mother reported that she had completed all of the foregoing requirements except for procuring housing. DCS noted that Mother was passing random drug screens and visiting the Children. The parenting plan was revised at the August 25, 2014 meeting to add the following additional requirements for Mother:

- Participate in case management at the Guidance Center;
- Participate in individual counseling as recommended by the Guidance Center
- Exhibit positive parenting skills so that she can parent her children in a safe and appropriate manner;
- Be drug free;
- Parenting assessment recommendations: . . . complete an intensive outpatient alcohol and drug treatment program . . . pass regular, random drug screens . . . participate in visitation with her children so their interaction will be observed and assessed.
- A & D Assessment recommendations: . . . complete substance abuse IOP. . . attend 2-5 12-step meetings per week . . . obtain a 12-step sponsor . . . attend mental health services and comply with their recommendations.

The permanency plan was revised at family and child team meetings held on February 23, 2015, March 3, 2016, and July 18, 2016 (at which time DCS noted that Mother had obtained housing). Mother's requirements under these subsequent plans remained substantially unchanged.

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H*., No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014) (citations omitted). "The trial court must then find that the noncompliance is substantial." *Id.* (citation omitted). Although the termination statute does not define what conduct

constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id*. at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id*. at 548.

We first note that, in its order terminating Mother's parental rights, the trial court made a specific finding that Mother's "credibility does not weigh well with the court concerning the tasks she completed on the permanency plans because she has not provided any proof. The court finds that [Mother's] testimony was all over the place and that she was evasive in some of her responses." When the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge, who had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *McCaleb*, 910 S.W.2d at 415; *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). With the foregoing in mind, we turn to the substantive question of whether the evidence clearly and convincingly supports the trial court's termination of Mother's parental rights on the ground of substantial noncompliance with the requirements of the permanency plans.

It is undisputed that the primary reasons for the Children's removal from Mother's custody were lack of supervision and Mother's drug use. In ratifying the foregoing permanency plans, the trial court held that the responsibilities placed on Mother were reasonably related to remedying the reasons for the Children's removal. Because the conditions of drug use and lack of supervision were the primary problems that were addressed in the permanency plans, the requirements that Mother pass drug screens and show the ability to properly care for the Children were of paramount importance. While we concede that Mother completed many of the tasks set for her in the permanency plans, she clearly failed to satisfy one of the most pressing requirements, i.e., to be drug free. Concerning Mother's lack of compliance with this requirement, in its order terminating her parental rights, the trial court found

> that drug concerns still exist today. The court finds that [Mother] attended rehab but even after rehab [Mother] tested positive for cocaine [on September 8, 2016]. [Mother] has not presented herself for drug screens.

The drug issues that existed when the children were first placed in [DCS's] custody still exist today. The court finds that the lack of supervision concerns [] are still present today. [Mother] has not demonstrated to the court that she has proper parenting skills; has not demonstrated to the court that she can care for the children financially; has not been involved with the children; and has not showed any care o[r] love for the children.

The trial court further found that DCS "went beyond reasonable efforts to assist [Mother] with the steps of her plan." The record supports the trial court's findings. Despite reasonable efforts on the part of DCS, Mother did not significantly address the root of the problem in this case, which is her continuing drug use. In fact, the evidence shows that, after the petition to terminate her parental rights was filed, Mother's drug use likely escalated. On March 20, 2017, Mother tested positive for marijuana and cocaine. On April 6, 2017, she refused a drug screen. On April 17 and 25, 2017, Mother failed to show up for scheduled drug screens and did not call. In the following months, Mother continued to refuse drug screens up to July 3, 2017. At the time of the hearing, Mother had not visited the Children since January 27, 2017 because of her failure to comply with the requirements concerning drug screens. Given the particular facts of this case, we cannot conclude that Mother substantially complied with the most necessary requirement of the permanency plan—to be drug free. Accordingly, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on this ground.

## C. Persistence of Conditions

The trial court also terminated Mother's parental rights on the ground of persistence of the conditions that led to the Children's removal from her home. Tennessee Code Annotated Section 36-1-113(g)(3) defines persistence of conditions as follows:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship

- 10 -

greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn.Ct.App.2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn.2015).

In *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn.Ct.App.2005), *perm. app. denied* (Tenn. Nov. 7, 2005), this Court held that "based on the statutory text and its historical development, [the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1-113(g)(3)] applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 872.

Here, the appellate record contains only a preliminary "supplemental protective custody order," which is dated May 7, 2018. In *In re Audrey S.*, this Court specifically concluded that a preliminary hearing order was not a sufficient adjudication of dependency and neglect so as to support the ground of persistence of conditions in a termination of parental rights case:

> The March 28, 1996 temporary custody order and preceding restraining order were entered in a dependency and neglect proceeding, but they were not based on a judicial finding that Audrey S. was dependent, neglected, or abused. The statutes and rules governing procedure in the juvenile courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings . . . . The function of the adjudicatory hearing is to determine whether the allegations of dependency, neglect, or abuse are true. Tenn. R. Juv. P. 27(b), 28(a), (f)(1). The Tennessee Rules of Evidence apply, Tenn. R. Juv. P. 28(c), and the juvenile court's finding that a child is dependent, neglected, or abused must be based on clear and convincing evidence, Tenn. Code Ann. 37-1-129(c); Tenn. R. Juv. P. 28(f)(1)(i)-(ii). The purpose of the dispositional hearing, which follows the adjudicatory hearing, is to determine the proper placement for a child who has been found to be dependent, neglected, or abused. Tenn. Code Ann. § 37-1-113(a) (2001); Tenn. R. Juv. P. 32. As its name implies, a preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing. Tenn. Code Ann. § 37-1-117(c); Tenn. R. Juv. P. 6(c), 16(a). Its function is to allow the juvenile court to decide whether the child should be removed from the parent's custody

- 11 -

pending the adjudicatory hearing. Tenn. Code Ann. § 37-1-117(c); Tenn. R. Juv. P. 16(c). The juvenile court is allowed to consider reliable hearsay in making its decision, Tenn. R. Juv. P. 16(a), and it can order the child removed from the parent's custody based on a finding of "probable cause" that the child is a dependent, neglected, or abused child, Tenn. Code Ann. § 37-1-114(a)(2) (2001).

The March 28, 1996 temporary custody order resulted from a preliminary hearing, not an adjudicatory hearing, and the restraining order was designed merely to preserve the status quo in advance of the preliminary hearing. The temporary custody order contains an implicit judicial finding of probable cause that Audrey S. was dependent, neglected, or abused. It does not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused. The juvenile court never held an adjudicatory hearing on Wilma S.'s petition for temporary custody of Audrey S., and there is no other court order in the record prior to the filing of the joint termination petition that reflects a finding of dependency, neglect, or abuse with respect to Audrey S. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights to Audrey S.

*In re Audrey S.*, 182 S.W.3d at 874-75 (some citations omitted). Likewise, in the instant case, the May 7, 2018 "supplemental protective custody order" finds "that there is **probable cause** to believe that the above named children are dependent and neglected" but does not find, by clear and convincing evidence, that the children are dependent and neglected. (Emphasis added). The same was true in *In re Audrey S.*, where "[t]he temporary custody order contain[ed] an implicit judicial finding of **probable cause** that Audrey S. was dependent, neglected, or abused. It d[id] not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused." *In re Audrey S.*, 182 S.W.3d 875. Under the holding of *In re Audrey S.*, such temporary orders are not sufficient to support termination of parental rights on the ground of persistence of conditions. Accordingly, we reverse this ground for termination of Mother's parental rights.[4]

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the children's best interests. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). When a parent has been found to be unfit (upon establishment of

---

[4] In its brief, DCS concedes that "the record does not contain the final dependency-and-neglect order" and concedes that this ground cannot be sustained on appeal.

- 12 -

ground(s) for termination of parental rights), the interests of parent and child diverge. ***In re Audrey S.***, 182 S.W.3d at 877. The focus shifts to the child's best interest. ***Id.*** at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. ***Id***. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." ***White***, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to the instant case, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> \*\*\*
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child.
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> \*\*\*
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R***., 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. ***In re Audrey S.***, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. §§ 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against

the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White*, 171 S.W.3d at 194.

In its order terminating Appellant's parental rights, the trial court made the following relevant findings concerning the Children's best interests:

> The court finds that there is clear and convincing evidence that termination of [Mother's] parental rights is in the best interest of the children. The court finds that [Mother] has not made changes in her conduct or circumstance, mainly her drug usage that would make it safe for the children to go home. The court finds that [Mother] has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. The court finds that [Mother] has not maintained regular visitation with the children. The court finds that [Mother] has not sent cards, letters or made phone calls to the children.
> The court finds that [Mother] does not have a meaningful relationship with [the children]. The court finds that [Mother] has not made any inquiries to anyone to ask about how the children were doing. The court finds that [Mother] has not paid child support in accordance with the guidelines. The court finds that [Mother] has not sent the children any birthday or Christmas gifts. The court finds that the children are in a pre-adoptive home and their resource parents wish to adopt them. The court finds that the children are thriving, happy and adjusting to their resource parents' home. The court finds that one of the children has advanced a grade level since being in the care of the resource parents. The court finds that the children have extended family members through their resource parents who have taken them in as their own nephews and grandchildren. The court finds that the children are bonded with their resource parents who are ready, willing, and able to adopt and care for these children as their own. The court finds that a change in caregivers or a change in the physical environment of the children would have a psychological and emotional impact on the children.

The record supports the trial court's findings. As discussed in detail above, despite DCS's reasonable efforts to assist her, Mother's drug use continues. This fact demonstrates that Mother has failed to make "an adjustment of circumstance, conduct, or conditions as to make it safe and in the [Children's] best interest[s] to be in [her] home . . . ." Furthermore, Mother has failed to exercise more than token visitation, and there is no

- 14 -

indication that the Children have any significant bond with Mother.  Moreover, the record shows that Mother has failed to provide even token support for the Children since they left her custody.  Meanwhile, the evidence indicates that the Children are thriving in their current foster placement.  The Children's foster mother testified that she and her husband wish to adopt these Children.  She stated that, although the Children had some adjustment issues when they first came to live with the foster family, both Children are now well settled and happy.  Since living with the foster family, Romeo has skipped a grade, and Davieon is also doing well in school.  The foster mother testified that the Children love to travel, ride bikes, skate, and read.  The Children consider the foster parents to be their parents and have also bonded with the extended family.  Given these facts, it is likely that a change in the Children's current environment would cause them psychological and emotional problems.  From the totality of the circumstances, we conclude that there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the Children's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the Children's removal from her home.  We affirm the trial court's termination of Mother's parental rights on the remaining grounds and on its finding that termination of Mother's parental rights is in the Children's best interests.  The case is remanded for such further proceedings as may be necessary and are consistent with this opinion.

_____
ARNOLD B. GOLDIN, JUDGE